# EXHIBIT T

031003.txt

c 2003 CNBC, Inc.  ALL RIGHTS RESERVED.

Prepared by Burrelle's Information Services, which takes sole responsibility
for accuracy of transcription.  No license is granted to the user of this
material other than for research.  User may not reproduce any copy of the
material except for user's personal or internal use and, in such case, only
one copy may be reproduced, nor shall user use any material for commercial
purposes or in any manner that may infringe upon CNBC, Inc.'s copyright or
proprietary interests in the material.

*****

SHOW:  Capital Report

DATE:  October 3, 2003

Announcer: This is CAPITAL REPORT, CNBC's nightly investigation into power and
money with CNBC Washington bureau chief Alan Murray and NBC News special
correspondent Gloria Borger.

ALAN MURRAY, co-host:

Hello.  Welcome to CAPITAL REPORT.  I'm Alan Murray.

GLORIA BORGER, co-host:

And I'm Gloria Borger.

Our top stories tonight: The White House counteroffensive on the leak scandal
and the failure to find weapons of mass destruction in Iraq.

*****

GLORIA BORGER, co-host:

There was good news on the economy today with jobs rising for the first time
since January.  But the White House was preoccupied with the rapidly moving
investigation into the possibly criminal outing of a CIA agent.

ALAN MURRAY, co-host:

Joining us now, NBC's Andrea Mitchell.  Andrea, thanks for being with us.

ANDREA MITCHELL (NBC News): Thank you.

MURRAY: We have news that a memo was sent today to the White House, asking for
information about this leak very quickly.  In fact, there's a deadline set for
next Tuesday.  Looks like they're trying to move rapidly on this, right?

MITCHELL: They are.  They are trying to narrow the focus of the investigation,
and try to wrap it up as quickly as possible. And truth be told that if they
are going to find anything and the track record on these leak investigations is
that they rarely do, because journalists don't want to disclose their sources.
But if they do find something, they want to do it as quickly as possible.  And
in this case, you've got a very small universe.  All they have to find out is
who are the people at the CIA who first talked to Bob Novak?  We pretty well
know that.  That's been disclosed.  And who were the people who talked to Novak
and to at least these two other reporters from Newsday who have been mentioned
in the White House memo, and that should be easily ascertained.

BORGER: Andrea, can you sort of explain to us how this story, which really
started in July--I mean Ambassador Wilson wrote his piece criticizing the
administration on July 6th.  A week later, Bob Novak writes his column, talking
                              Page 1

031003.txt

about Ambassador Wilson's wife, and here we are at the beginning of October, and suddenly it's news.

MITCHELL: Well, it does seem a little mysterious. Why all of a sudden is there some political agenda going on? And obviously, there is a lot of politics going on here.

BORGER: Really?

MITCHELL: You know, shocking that politics would be taking place here in Washington, and there's a lot of hypocrisy on all sides. I mean, this is a situation where Democrats, including Hillary Rodham Clinton, have been calling for a special counsel. The very people who all during the Clinton years fought and fought and fought, she most primarily, fought against having a special counsel. And Republicans who always said, you know, that the Justice Department cannot handle this are saying, `Well, why can't John Ashcroft handle this?' You know, just substitute Janet Reno's name for John Ashcroft, and you see just how silly all this appears on the surface.

But why did it take so long? July 6th, Joe Wilson comes out and discloses that he was, indeed, the secret envoy who went to Niger for the CIA, and this is an op-ed on a Sunday morning in the New York Times. Well, Saturday night, we see that this is coming, so I was substituting on "Meet The Press," and called Wilson and said, `Would you come on?' And we had him come on the show, so he's also on television. Now that certainly was a double whammy as far as the Bush administration was concerned. Interestingly, Bob Novak was also one of my invited on that guests on that program a different subject, so they clearly met for the first time, Wilson and Novak that day.

BORGER: That's interesting.

MITCHELL: Great ironies. That week, I followed up. We did a report on NBC.

BORGER: Did Wilson's wife come, by the way, to the studio or not?

MITCHELL: Not at all.

BORGER: OK. All right. Just thought I'd ask.

MITCHELL: Separate lives. So that week, on the 8th of July, I did a story on "Nightly News" about Wilson's allegations focusing on Niger, the uranium, not focusing on any issue involving his spouse. Then on the 14th, the bombshell from Novak, which was the revelation which clearly he says came from two administration officials--he wrote that in his column--that she was a covert--rather an operative, as he put it, at the CIA. The clear implication that she had somehow been involved in getting him to take this assignment and in somehow positioning him, that this was part of the overall attempt of the CIA to go up against the White House and to challenge the president's policy. So this is where it fits within the ongoing wars which are only becoming more heated between the Cheney-Bush White House, Rumsfeld hard-liners on weapons of mass destruction, and the more skeptical analysts and operatives, CIA officers, covert officers at both the CIA and the State Department.

We should point out that I did do a story after that, on July 21st. I interviewed Wilson, did a story on the fact that he was now alleging that there was an attempt to bring his wife into it, that this was an administration attempt to intimidate him. So it was on the air in July. But then the CIA secretly asked the Justice Department to look into this. The Justice Department took its sweet time, frankly, came back to the CIA and said, `Answer these 11 questions: Was she covert? Was there a possible violation?' Eleven questions had to be answered prima facie. The CIA responded to the Justice Department. And last Friday, as we reported at the time, the Justice Department said, `OK, we're going to proceed and investigate.' That's why the

031003.txt

lag time.

MURRAY: Andrea, a couple of quick questions. One, you said something earlier
that I wasn't sure about. Bob Novak reported that two administration officials
told him this. Are we any closer to having any idea who those two people are?

MITCHELL: No. And you know, there's a lot of rumor. There's been denials from
the White House. Joe Wilson, he now inappropriately suggested that Karl Rove
may have been the person. What he really should have been saying is that he
believes Karl Rove was circulating the story after Novak put it out. So we
don't know who that person was. There have been suggestions regarding the vice
president's office. These have been denied. But it's really...

MURRAY: Right.

MITCHELL: ...inappropriate, I think, for any of us to suggest that someone
might have been involved, because we're talking about a possible crime, and we
have no evidence of that.

MURRAY And the second question is: Do we have any idea how widely known it was
in Washington that Joe Wilson's wife worked for the CIA?

MITCHELL: It was widely known among those of us who cover the intelligence
community and who were actively engaged in trying to track down who among the
foreign service community was the envoy to Niger. So a number of us began to
pick up on that. But frankly I wasn't aware of her actual role at the CIA and
the fact that she had a covert role involving weapons of mass destruction, not
until Bob Novak wrote it.

MURRAY: All right. Andrea, thanks very much for being with us.

MITCHELL: My pleasure.

*****

GLORIA BORGER, co-host:

Our next guest is no stranger to high-profile political scandals. Bob Bennett
represented President Bill Clinton in the Paula Jones case, and he's also
defended Republicans, including former Defense Secretary Caspar Weinberger
during the Iran-Contra affair. Thanks so much for being with us on CAPITAL
REPORT, Mr. Bennett.

You have had years of experience dealing with these so-called independent
counsels, whether it was representing the president of the United States or the
secretary of Defense. This week, you've heard a lot of hue and cry about
bringing back a special counsel. Is it a good idea?

Mr. ROBERT BENNETT (Former Attorney to President Clinton): It's a terrible
idea. When I was representing Mr. Weinberger, all of the Republicans thought
it was a dreadful idea. And when President Clinton was being dealt with by Ken
Starr, all the Democrats thought it was a bad idea.

ALAN MURRAY (Co-host): Who was right?

Mr. BENNETT: They were both right then. But it's a horrendous idea, because
you're taking the law enforcement power of the United States and putting it in
into one person who is essentially, in real world, unaccountable, and that's a
very bad idea.

MURRAY: The cost of these things tend to be huge. I mean, the investigation
into the Agricultural Secretary Michael Espy was more than 25 million. The
Whitewater investigation was more than 75 million. What happens in these

Page 3

# EXHIBIT U

# Imus in the Morning
## "CIA Identification Leak"
### MSNBC 11-23-2005 11Min.

<u>Andrea Mitchell:</u> (A. Mitchell) Chief NBC Correspondent NBC News.
<u>Imus :</u> (IMUS) Imus in the morning host.
<u>Charles:</u> Imus show assistant

**Time IN:** 8:08am ET
**Time OUT:** 8:19am ET

**TIME IN >>>>>>>>>>>>>**
**8:08am**
**IMUS:** The Chief foreign affairs Correspondent with NBC News Andrea Mitchell, good morning
**A. Mitchell:** Good morning Mr. Imus
**A. Mitchell:** I've got a bad cold but Chuck I'll be better for tomorrow, oh and I'm bringing the cranberry sauce is there anything else you need?
**IMUS:** Well that's nice of you.
**A. Mitchell:** Did you want us to bring the clarinet?
**McCord:** I would love for him to...I wouldn't want to impose...but if he wants to that's fine.
**IMUS:** Anyway Andrea we talked with Tim Russert on yesterday...Mr. Russert I call him. And uh he's one of my sons hero's...one I approve of by the way...one of my hero's actually. It seems unclear about what you said back in October 2003. You were asked by this Allen Murray of CNBC" Do you know how widely know in Washington that Joe Wilson's wife worked for the CIA"? And you said it was widely know by those of us that cover the intelligence community, and who were actively engaged in trying to track down who among the Foreign Service community who was the envoy to Niger?

**8:09am**
**A. Mitchell:** I have been trying to find out what the heck I was talking about frankly. I know that there is confusion because I'm confused. I know what I know at the time because I know that I met Joe Wilson on July 6th on the set of Meet the Press cause I was interviewing him. It was the first time he was on camera and I know I did not have any idea that his wife worked for the CIA. I had been trying to find out who the envoy was. I was not one of the people in Washington who knew Joe Wilson, so that's what I've been working on.

**8:10am**
**IMUS:** So when you told Allen Murray at CNBC that it was widely know that his wife worked for the CIA.
**A. Mitchell:** You know I don't even remember the deal...
**IMUS:** Were you drunk?
**A Mitchell:** ...I've gone back and talked to the people that I was working with at the time. I know that I didn't know about the wife. I knew that there was an envoy and we were working...trying to find that out. All I can figure is that I misunderstood Allen's question and screwed it up. Not that you or anybody else has ever screwed anything up.
**IMUS:** Well we know I do...but I don't have the credentials you do...I wish I did.
**A. Mitchell:** I wish I could understand what the heck I was talking about. I know the question now...I've gone back and reread it and frankly I think I thought that he was asking if I knew there was an envoy...I know I didn't know about Joe Wilson's wife till after the column because when the column came out I went into my producer and said...look at this...how the heck did we not know that? And at the same time we were talking with Russert and everyone else...is this a different part of the story that we didn't know about. So clearly back in October of 2003 I screwed it up.

**8:11am**

**IMUS:** Well his question seems plain..."Do we have any idea how widely known it was in Washington Wilson's wife worked for the CIA and you said it was widely known"

**A. Mitchell:** And I said it was widely known and we were trying to track down who among the foreign service communities was the envoy to Niger...so far so good, o.k. So a number of us started to pick up on that but frankly I wasn't aware of her actual role at the CIA and the fact that she had a covert roll involving weapons of Mass destruction until Bob Novak wrote it.

IMUS: Well that part is clear.

A. Mitchell: Well what's not clear that I didn't know about her role at the CIA until Bob Novak wrote it. I obviously got it muddled.

**8:12am**
**IMUS:** What this suggests to me is that you knew that she worked at the CIA but you didn't know what she did there.

**A. Mitchell:** """"Not a verbally distinguishable response""""

**IMUS:** Than why did you say it for Andrea?

**A. Mitchell:** I messed up...I think I was confused by the timeline. I didn't focus on the timeline as we clearly are now.

**IMUS:** Did you ever have a discussion with Russert about it?

**A. Mitchell:** Sure after the fact...well I've had conversations with Russert obviously after Joe Wilson came out on Meet the Press and we all talked about the sixteen words...that's what we were all focused on...we were focused on Niger, Uranium, were there WMD's...that's what the whole focus was not on his wife. Then Joe Wilson's wife was mentioned by Bob Novak and it became a major issue when the CIA referred to the Justice Department for investigation.

**8:13am**
**IMUS:** Did you talk to the same source that Woodward talked to?

**A. Mitchell:** I don't know who Woodward talked to, I have my own """"Inaudible"""" but I have no factual base.

**IMUS:** Who do you think it was?

**A. Mitchell:** I think a lot of people think it was Richard Armitage because he is the only one of now a legion of Washington players who have said I wasn't the source. Everyone's coming forward to say they weren't Woodward's source and of course there is also speculation that Woodward's source and Bob Novak's secret source is one in the same...the same person.

**IMUS:** You know why we are looking for these weapons of mass destruction maybe we could look for old Dick's neck huh.

**A. Mitchell:** Well he use to be a wrestler and a weight lifter.

**IMUS:** I understand that just try to add a little levity to this.

**A. Mitchell:** We could use some levity in this whole mess couldn't we? This has not been a great day for journalism.

**8:14am**
**IMUS:** Well you know I think there has been some questions about you...obviously I'm not patronizing you but it's because of the respect that you have as a journalist and as a reporter.

**A. Mitchell:** Well I appreciate that but I gotta tell ya

**IMUS:** Someone who's very careful about what they say

**A. Mitchell:** I have gone over this I don't know how many times...I was quite surprised to hear about it because it isn't consistent with anything in my memory I cant find any notes that reflect this alleged knowledge and so I was Mutteld on the timeline that's all I can imagine

**IMUS:** Have you been subpoenaed?

**A. Mitchell:** No not at all

**IMUS:** Have you talked to Fitzgerald informally?

**A. Mitchell:** No..No way....... I didn't have any knowledge about this. You know one of the things that the Washington Post wrote an inaccurate story in the middle of this whole period saying that I was one of the six people who had been leaked to before the Novak column and that's how my name first got into this...which was not true...they didn't check with me they didn't call me...I was in the office all day...they wrote the story on Monday morning and it was totally wrong.

**8:15am**

**IMUS:** Well Russert was a little short with me yesterday.

**A. Mitchell:** Understandably he didn't need to be questioned about what I knew and when did I know it...its my problem I obviously misspoke I'm the best source for that and I'm glad your talking to me about it.

**IMUS:** It was almost like he was trying to hide something

**A. Mitchell:** He was just trying to be polite...and you know frankly I can't figure out what the heck I was talking about. I guess I was drinking.

**IMUS:** I realize...well this is an unfair thing to say...I was going to say all you folks in Washington are in bed with one another...but that would be an awful thing to say.

**A. Mitchell:** In that case it's only true with me and my husband.

**IMUS:** to get you to comment on Bob Woodward's behavior.

**8:16am**

**A. Mitchell:** Bob Woodward is a terrific reporter...no ones like Bob Woodward he has done extraordinary work...and if you read plan of attack and Bush at war and his other books about this whole period he has unique exclusive reporting and I can understand completely in the course of doing a book interview someone said something casually that was not part of his focus part of his main interview and it was not even something important until it became important 2 years...3 years later.

**IMUS:** But what I think has irritated a number of reporters and particularly the Washington Post is that Mr. Woodward was appearing on these various television programs commenting on this case sitting on this information

**A. Mitchell:** Well if people make one mistake in the course of a 35 or 40-year career when they have been bullet proof in terms of not making errors...all the writings he has done I think we can cut someone some slack.

**IMUS:** I agree and I'm not making any judgment at all I'm just the messenger no reason to snap at me...but I'd call him a skunk so.

**A. Mitchell:** I don't think I'd agree with that...Bob Woodward is a great guy, reporter and author and...He and Lynn Downing go all the way back to Watergate...I watched Larry King the other night and he pointed out that Lynn was one of his editors on Watergate...these people have gone through the wars together and this is going to be a minor blip.

**IMUS:** Bradley said that Woodward was not under any obligation tell anybody everything he knows.

**A. Mitchell:** Well that's what reporters do...they accumulate information until its ready to be written about or broadcasted.

**IMUS:** Well it does seem fair to...well not surmise but to speculate that had Woodward of shared the information that he had when he had it that they may not have indicted Scooter Libby.

**A. Mitchell:** Not necessarily we don't know what the evidence is that they have in any part of this case we don't know what Fitzgerald has.

**IMUS:** Of course Mr. Libby doesn't help himself by lying of course he claims he just remembered something that """Inaudible Multiple people talking""" were did that word come from..."Justremmembered"...is that a word.

**Charles:** It is.

**IMUS:** Yeah you've been using it all morning.

**A. Mitchell:** I will from now on.

**Charles:** Do you also know the term Hamina Hamina

**IMUS:** Charles is a creep

**A. Mitchell:** Charles is not a creep...and you should stop teaching bad language to Wyatt Imus.

**IMUS:** I didn't teach him anything he has to call them as he sees them.

**Charles:** He's been reading Fear and Loathing in Las Vegas

**IMUS:** Happy Thanksgiving

**TIME OUT >>>>>>>>>>>>>>>>>>>**

# EXHIBIT V

**Imus in the Morning**
**Interview with Andrea Mitchell**
**11-10-2005, MSNBC, 7Min.**

<u>**Andrea Mitchell:**</u> (A. Mitchell) NBC correspondent
<u>**Don Imus:**</u> (IMUS:) Show host

**Time IN:** 7:07am ET
**Time OUT:** 7:14am ET

**TIME IN >>>>>>>>>>>**

    <u>**7:07am**</u>
    **IMUS:** Andrea Mitchell a foreign affairs correspondent for NBC News, where are you this morning
    Andrea?
    **A. Mitchell:** I am in Washington
    **IMUS:** how are you doing baby?
    **A. Mitchell:** I'm fine
    **IMUS:** What's going on?
    **A. Mitchell:** well, everyone's, you know, upset about these bombing the horrible bombings. We were
    out covering Shallabi yesterday who has is indeed getting a red Carpet treatment here although the way
    the administration is trying to low key his visit is that when he came to the state department they were
    no press coverage of his meeting with Condoleeza Rice, but he did meet with Condoleeza Rice he's
    gonna meet with defense secretary Rumsfield, he's supposedly gonna meet with Cheney on Monday
    **IMUS:** Me and doctor Rice could go shopping together

    <u>**7:08am**</u>
    **A. Mitchell:** well the issue, the issue with Shallabi is why is he being greeted when there is still an
    investigation into what he allegedly did, he was in Iran only last week
    **IMUS:** ...(OH)...
    **A. Mitchell:** and what they're saying is that he is a deputy prime minister running for office we
    believe and he could end up being the leader of Iraq after this whole process is over
    **IMUS:** ...right...
    **A. Mitchell:** he is quite the contender, when asked if he was going to run his really, original response
    **IMUS:** Will Judith Miller be the first lady of Iraq
    **A. Mitchell:** (hehe) when asked if he was going to run he said that was for me to know and for you to
    find out so we're doing international, you know, diplomacy on this
    **IMUS:** I love cute answers from war criminals don't you??
    **A. Mitchell:** yeah
    **IMUS:** what else is going on??
    **A. Mitchell:** Well Judith Miller,
    **IMUS:** yeah get out...!
    **A. Mitchell:** letter of quote resignation, although clearly she negotiated uh departure some people
    would call it being fired
    **IMUS:** right
    **A. Mitchell:** And the New York Times is a lot of tough internal issues, it not been a happy chapter by
    any stretch of the imagination plus the poll, you saw the NBC wallstreet journal poll yesterday?

    <u>**7:09am**</u>
    **IMUS:** no I didn't, tell me about it
    **A. Mitchell:** The NBC wallstreet journal poll is just bad news for this administration on every possible
    front, not just the approval rating in general but on 16 of 19 key questions republicans and the
    president do not do well including the war on terror and everything else
    **IMUS:** I hate it when bad things happen to people don't you, you know I had jenny Haworth on
    **A. Mitchell:** Did you see the clip of that uh...interview was part of David Gregories report last night on
    Nightly News.
    **IMUS:** Yes..Yes I did see that...which I'm sorry you mentioned that...that was an unauthorized use of a

clip from this program..nobody asked me and Brian...Brian Williams nor Bean pole called me to ask me if they could use that footage so they can talk to David Boise about it later today...but anyway what was your point.

### 7:10am

**A. Mitchell:** The point that you were trying to make when I interrupted you was that J.D. Hayworth said that when you asked the obvious question...the correct question do you want the President to campaign and raise money for you and be out there in the mid-term elections and he said no.

**IMUS:** Um you know but that reminds me that there has been some speculation that you might be called as a defense witness for Scooter Libby because apparently on October 3rd 2003 you said...and correct me if I'm wrong here that it was widely known that Joe Wilson's wife worked for the CIA.

**A. Mitchell:** Well it was taken out of contexts...

**IMUS:** Well isn't that always the case?

### 7:11am

**A. Mitchell:** The fact is that I did not know before the Novak column cause I had interviewed Joe Wilson several times on Meet The Press and in none of those interviews did any of this come up on or off camera...I got to tell you. In fact what I was trying to express was that it was widely known that there was an envoy that I was tasking my producers, and researches, and myself to find out who was this secret envoy...I did not know. We only knew because of an article in the Washington Post by Walter Pincus because of the column by Nicholas Kristof that someone had gone.

**IMUS:** So you didn't say that it was widely known that his wife worked for the CIA?

**A. Mitchell:** I said that it was widely known that an envoy had gone...let me try and find the quote.........but the fact is what I was trying to say in the rest of that sentence...I said we did not know who the envoy was until the Novak Column.

**IMUS:** Did you mention Wilson or his wife or the CIA?

**A. Mitchell:** Yes

**IMUS:** And did you mention...

**A. Mitchell:** this was a long interview on CNBC

### 7:12am

**IMUS:** No I understand...but in any context did you say it was known...widely known...or even known...not known or even speculated that his wife worked for the CIA?

**A. Mitchell:** I said that it was widely known that...I need that quote...but I said it was widely known that Wilson was the envoy and that his wife worked at the CIA...

**IMUS:** ok so you did say it...why did it take me a minute to get that out of you?

**A. Mitchell:** No I was talking about after the Novak Column

**IMUS:** OH...

**A. Mitchell:** and that's what was not clear...I may of misspoken in October of 03 in that interview.

**IMUS:** So when was the Novak column?

**A. Mitchell:** That column was on the 14th of July I believe July 12th or 14th

**IMUS:** of what year?

**A. Mitchell:** of 03

**IMUS:** So this is well after that

**A. Mitchell:** This is well after that...that's why the confusion...I was trying to express what I knew before the Novak column and I think there was some confusion in that one interview...

**IMUS:** who did you find it out from Russert

**A. Mitchell:** ...I found it out from Novak

**IMUS:** That would be Russert's line

### 7:13am

**A. Mitchell:** You know Tim Russert better than that

**IMUS:** which would break little Wyatt Imus heart by the way

**A. Mitchell:** That would just not happen...but this is one of those cases...we have a whole new world of journalism out there...with people writing blogs grabbing one thing and not everything else that I've written and said about this...and go to town with it ...if it ...if it supports there political point of view

then
**IMUS:** Bingo..
**A. Mitchell:** Bingo...exactly
**IMUS:** Everything else ok with you?
**A. Mitchell:** Well I was in Sarasota where you...where a thousand people turn out on Saturday in Sarasota at the Opera House at the book fair and at least five hundred of them ask me about Don Imus
**IMUS:** What do you tell them by the way?
**A. Mitchell:** How great and smart you are
**IMUS:** Yeah...ok so your still lying...you lied about this Wilson thing and you're lying about me..(HA)
**A. Mitchell:** No I only lie about you Don cause God knows we wouldn't want the world to know how bad you really are...
**IMUS:** What a prick I am...thanks Andrea...ok Andrea Mitchell here on the Imus in the morning

**7:14am**

**TIME OUT >>>>>>>>>>>>>**

# EXHIBIT W

1 of 5 DOCUMENTS

Copyright 2003 National Broadcasting Co. Inc.
NBC News Transcripts

**SHOW:** NBC Nightly News (6:30 PM ET) - NBC

July 12, 2003 Saturday

**LENGTH:** 366 words

**HEADLINE:** CIA Director George Tenet accepts the blame for Bush's misinformation in his State Of The Union address

**ANCHORS:** JOHN SEIGENTHALER

**REPORTERS:** DAVID GREGORY

**BODY:**

JOHN SEIGENTHALER, anchor:

President Bush said today that when it comes to the controversy surrounding his State of the Union speech and the inaccurate information it included on Iraq, the case is closed. That follows CIA director George Tenet's announcement that he takes the blame for the mistake. But with the president's poll numbers dropping, and Democrats raising new questions, the case, for now, appears to be anything but closed. NBC's David Gregory reports.

DAVID GREGORY reporting:

In Nigeria today, the president welcomed his CIA chief's mea culpa the now discredited piece of Iraq intelligence.

President GEORGE W. BUSH: I've got confidence in George Tenet, I've got confidence in the men and women who work at the CIA, and I continue to look forward to working with them as we win this war on terror.

GREGORY: Late yesterday, George Tenet said in a statement that he made a mistake allowing the president to assert in his State Of The Union address that Iraq was trying to buy uranium for nuclear weapons in Africa. His concession followed a concerted effort by the president and other top White House officials to target Tenet for blame after they were forced to admit six months after the president's speech that the Iraq-Africa claim was unreliable.

Pres. BUSH: Thank you all.

GREGORY: The controversy over pre-war intelligence has overshadowed much of Mr. Bush's message during this five-day trip to Africa, including his promise to add $15 billion to fight AIDS on the continent. After meeting with AIDS patients in the Nigerian capital of Abuja today, Mr. Bush again pressured Congress to fully fund his request for the upcoming year.

Pres. BUSH: The people of Africa are fighting HIV/AIDS with courage, and I'm here to say you will not be alone in your fight.

GREGORY: After the Iraq intelligence issue dogged him throughout his trip to Africa, the president is ready to return home and move on. Aides say Mr. Bush believes Director Tenet's concession closes this matter. The question is whether critics, including those on Capitol Hill who have called for an investigation, feel the same way. David Gregory, NBC News, Abuja, Nigeria.

**LOAD-DATE:** August 20, 2003

# EXHIBIT X

# TIME

## NATION **POLITICS**

Thursday, Jul. 17, 2003

# A War on Wilson?

**Inside the Bush Administration's feud with the diplomat who poured cold water on the Iraq-uranium connection**

By MATTHEW COOPER, MASSIMO CALABRESI AND JOHN F. DICKERSON

Has the Bush Administration declared war on a former ambassador who conducted a fact-finding mission to probe possible Iraqi interest in African uranium? Perhaps.

Former Ambassador Joseph C. Wilson raised the Administration's ire with an op-ed piece in The New York Times on July 6 saying that the Administration had "twisted" intelligence to "exaggerate" the Iraqi threat. Since then Administration officials have taken public and private whacks at Wilson, charging that his 2002 report, made at the behest of U.S. intelligence, was faulty and that his mission was a scheme cooked up by mid-level operatives. George Tenet, the director of the Central Intelligence Agency, took a shot at Wilson last week as did ex-White House Press Secretary Ari Fleischer. Both contended that Wilson's report on an alleged Iraqi effort to purchase uranium from Niger, far from undermining the president's claim in his State of the Union address that Iraq sought uranium in Africa, as Wilson had said, actually strengthened it. And some government officials have noted to TIME in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction. These officials have suggested that she was involved in her husband's being dispatched Niger to investigate reports that Saddam Hussein's government had sought to purchase large quantities of uranium ore, sometimes referred to as yellow cake, which is used to build nuclear devices.

In an interview with TIME, Wilson, who served as an ambassador to Gabon and as a senior American diplomat in Baghdad under the current president's father, angrily said that his wife had nothing to do with his trip to Africa. "That is bulls__t. That is absolutely not the case," Wilson told TIME. "I met with between six and eight analysts and operators from CIA and elsewhere [before the Feb 2002 trip]. None of the people in that meeting did I know, and they took the decision to send me. This is a smear job."

Government officials are not only privately disputing the genesis of Wilson's trip, but publicly contesting what he found. Last week Bush Administration officials said that Wilson's report reinforced the president's claim that Iraq had sought uranium from Africa. They say that when Wilson returned from Africa in Feb. 2002, he included in his report to the CIA an encounter with a former Nigerien government official who told him that Iraq had approached him in June 1999, expressing interest in

expanding commercial relations between Iraq and Niger. The Administration claims Wilson reported that the former Nigerien official interpreted the overture as an attempt to discuss uranium sales.

"This is in Wilson's report back to the CIA," White House Press Secretary Ari Fleischer told reporters last week, a few days before he left his post to join the private sector. "Wilson's own report, the very man who was on television saying Niger denies it...reports himself that officials in Niger said that Iraq was seeking to contact officials in Niger about sales."

Wilson tells the story differently and in a crucial respect. He says the official in question was contacted by an Algerian-Nigerien intermediary who inquired if the official would meet with an Iraqi about "commercial" sales — an offer he declined. Wilson dismisses CIA Director George Tenet's suggestion in his own mea culpa last week that the meeting validates the President's State of the Union claim: "That then translates into an Iraqi effort to import a significant quantity of uranium as the president alleged? These guys really need to get serious."

Government officials also chide Wilson for not delving into the details of the now infamous forged papers that pointed to a sale of uranium to Iraq. When Tenet issued his I-take-the-blame statement on the alleged Iraq-Niger uranium connection last week, he took a none-too-subtle jab at Wilson's report. "There was no mention in the report of forged documents — or any suggestion of the existence of documents at all," Tenet wrote. For his part Wilson says he did not deal with the forgeries explicitly in his report because he never saw them. However, Wilson says he refuted the forgeries' central allegation that Niger had been negotiating a sale of uranium to Iraq. Wilson says he explained in the report that several Nigerien government signatures would be required to permit such a sale — signatures that were either absent or clearly botched in the forged documents.

Administration officials also claim that Wilson took at face value the claims of Nigerien officials that they had not sold uranium ore to Saddam Hussein. (Such sales would have been forbidden under then-existing United Nations sanctions on Iraq.) "He spent eight days in Niger and he concluded that Niger denied the allegation." Fleischer told reporters last week. "Well, typically nations don't admit to going around nuclear nonproliferation,"

For his part, Wilson says that the Administration conflated the prior report of the American ambassador to Niger with his own. Wilson says a report by Barbro Owens-Kirkpatrick, the American ambassador to Niger, addresses the issue of Nigerien government officials disputing the allegation. Wilson says that he never made the naïve argument that if Nigerien officials denied the sales, then their claims must be believed.

A source close to the matter says that Wilson was dispatched to Niger because Vice President Dick Cheney had questions about an intelligence report about Iraq seeking uranium and that he asked that the CIA get back to him with answers. Cheney's staff has adamantly denied and Tenet has reinforced the claim that the Vice President had anything to do with initiating the Wilson mission. They say the Vice President merely asked

routine questions at an intelligence briefing and that mid-level CIA officials, on their own, chose to dispatch Wilson.

In an exclusive interview Lewis Libby, the Vice President's Chief of Staff, told TIME: "The Vice President heard about the possibility of Iraq trying to acquire uranium from Niger in February 2002. As part of his regular intelligence briefing, the Vice President asked a question about the implication of the report. During the course of a year, the Vice President asked many such questions and the agency responded within a day or two saying that they had reporting suggesting the possibility of such a transaction. But the agency noted that the reporting lacked detail. The agency pointed out that Iraq already had 500 tons of uranium, portions of which came from Niger, according to the International Atomic Energy Administration (IAEA). The Vice President was unaware of the trip by Ambassador Wilson and didn't know about it until this year when it became public in the last month or so. " Other senior Administration officials, including National Security Adviser Condoleezza Rice, have also claimed that they had not heard of Wilson's report until recently.

After he submitted his report in March 2002, Wilson says, his interest in the topic lay dormant until the State of the Union address in January 2003. In his speech, the President cited a British report claiming that Hussein's government had sought uranium in Africa. Afterward, Wilson says, he called a friend at the Africa bureau of the State Department and asked if the reference had been to Niger. The friend said that he didn't know but, says Wilson, allowed the possibility that Bush was referring to some other country on the continent. Wilson says he let the matter drop until he saw State Department spokesman Richard Boucher say a few months later that the U.S. had been fooled by bad intelligence. It was then that Wilson says he realized that his report had been overlooked, ignored, or buried. Wilson told TIME that he considers the matter settled now that the White House has admitted the Bush reference to Iraq and African uranium should not have been in the State of the Union address.

Copyright © 2006 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.

Privacy Policy

# EXHIBIT Y


We just saved a fortune on our life insurance! Did you?
FREE QUOTE! CLICK HERE
10 Yr Level Term    35
Life Insurance       40
$500,000 Policy      45
(monthly premiums)  60



# TIME ARCHIVE
### 1923 to the Present



Get 4 FRE
TRIAL Iss
clic

▸Home | ▸Archive | ▸Ask the Archivist          ▸My Account | ▸Feedback    Text si:

Articles    Covers
◉ Search [                    ]  [Search]   • See All Covers
                                            • Search Tips
○ Search From: [Jan ▾] [1 ▾] [1923 ▾]  through  [Dec ▾] [31 ▾] [2006 ▾]

■ ARCHIVE FE

♦ Archive Homep
  Best of the archi

• Collections:
  Scientology
  The Holocaust
  Albert Einstein
  Baseball Greats
  Collections Inde

• TIME Digital Ed
  Articles, photos,

• Browse by Issu
  Click covers to s

• Cover Galleries
  Browse by topic

• Search Tips:
  Find the articles

ADVERTISEM!

Cover

# "What I Told The Grand Jury"

**EXCLUSIVE** Matthew Cooper reveals exactly what Karl Rove told him--and what the special counsel zeroed in on
By MATTHEW COOPER

Print  E-Mail  Save  Popular
▸Subscribe to TIME

■ **ALSO IN THIS ISSUE**

Jul. 25, 2005



Table of Contents »
Photos and Graphics »

Jul. 25, 2005

It was my first interview with the President, and I expected a simple "Hello" when I walked into the Oval Office last December. Instead, George W. Bush joked, "Cooper! I thought you'd be in jail by now." The leader of the free world, it seems, had been following my fight against a federal subpoena seeking my testimony in the case of the leaking of the name of a CIA officer. I thought it was funny and good-natured of the President, but the line reminded me that I was, very weirdly, in the Oval Office, out on bond from a prison sentence, awaiting appeal--in large part, for protecting the confidence of someone in the West Wing. "What can I say, Mr. President," I replied, smiling. "The wheels of justice grind slowly." After a fight that went all the way to the Supreme Court, the wheels of justice have stopped grinding--for me, anyway. Last week I testified before the federal grand jury investigating the leak. I did so after I received a specific last-minute waiver from one of my sources, Karl Rove, the President's top political adviser, releasing me from any claim of confidentiality he might have about our conversations in July 2003. Under federal law grand jurors and prosecutors are sworn to secrecy but those who testify, like me, are under no such obligation, which is why I'm able to tell you what happened in the grand jury room. Patrick Fitzgerald, the special counsel, told me that he would prefer that I not discuss the matter, and I suspect he said the same thing to White House officials who are now treating his request as a command and refusing to comment on the case. I don't know if I can illuminate this confounding investigation, but I can at least explain my small part in it. Like the blindfolded man and the elephant, all I know is what seems to be in front of me.

So here's what happened last Wednesday.

Before going into the grand jury room at 9:30 a.m., my lawyers and I met briefly with Fitzgerald, a couple of his attorneys and the lead FBI agent in the case. It was, to say the least, unsettling sitting there in the federal courthouse in Washington with the man who, for months, had tried to get me to testify or he would put me in jail. Fitzgerald counseled me that he wanted me to answer completely but didn't want to force any answers on me or have me act as if I remembered things more clearly than I did. "If I show you a picture of your kindergarten teacher and it really refreshes your memory, say so," he said. "If it doesn't, don't say yes just because I show you a photo of you and her sitting together."

Grand juries are in the business of handing out indictments, and their docility is infamous. A grand jury, the old maxim goes, will indict a ham sandwich if a prosecutor asks it of them. But I didn't get that sense from this group of grand jurors. They somewhat reflected the demographics of the District of Columbia. The majority were African American and were disproportionately women. Most sat in black vinyl chairs with little desks in rows that were slightly elevated, as if it were a shabby classroom at a rundown college. A kindly African-American forewoman swore me in, and when I had to leave the room to consult with my attorneys, I asked her permission to be excused, not the prosecutor's, as is the custom. These grand jurors did not seem the types to passively indict a ham sandwich. I would say one-third of my 2 1/2 hours of testimony was spent answering their questions, not the prosecutor's, although he posed them on their behalf. I began to take notes but then was told I had to stop, so I'm reliant on memory.

For my part, I sat at the end of an L-shaped table next to one of the prosecutor's lawyers, who handed me various documents to review while an overhead projector displayed the documents on a screen near me. Virtually all the questions centered on the week of July 6, 2003. I was new to covering the Bush White House, having been the deputy Washington bureau chief for TIME. As it happens, that week was a big one at the White House. On that Sunday, the New York *Times* had published former Ambassador Joseph Wilson's now infamous Op-Ed describing his mission to Niger to investigate whether Saddam Hussein was seeking uranium to make nuclear weapons. Wilson said he had found no evidence of that and was confounded as to why the President would claim otherwise in his 2003 State of the Union address. As a freshly minted White House correspondent, I told the grand jury, I was all over that story by midweek, especially because it emerged as a likely candidate for TIME's cover the following Monday.

The grand jurors wanted to know what was on my mind, and I told them. The White House had done something it hardly ever does: it admitted a mistake. Shortly after Wilson's piece appeared, the White House said that the African uranium claim, while probably still true, should not have been in the President's State of the Union address because it hadn't been proved well enough. That was big news as the media flocked to find out who had vetted the President's speech. But at the same time, I was interested in an ancillary question about why government officials, publicly and privately, seemed to be disparaging Wilson. It struck me, as I told the grand jury, as odd and unnecessary, especially after their saying the President's address should not have included the 16-word claim about Saddam and African uranium.

I told the grand jurors that I was curious about Wilson when I called Karl Rove on Friday, July 11. Rove was an obvious call for any White House correspondent, let alone someone trying to prove himself at a new beat. As I told the grand jury--which seemed very interested in my prior dealings with Rove--I don't think we had spoken more than a handful of times before that. I recalled that when I got the White House job a couple of weeks earlier, I left a message for him trying to introduce myself and announce my new

posting.

As I told the grand jury--and we went over this in microscopic, excruciating detail, which may someday prove relevant--I recall calling Rove from my office at TIME magazine through the White House switchboard and being transferred to his office. I believe a woman answered the phone and said words to the effect that Rove wasn't there or was busy before going on vacation. But then, I recall, she said something like, "Hang on," and I was transferred to him. I recall saying something like, "I'm writing about Wilson," before he interjected. "Don't get too far out on Wilson," he told me. I started taking notes on my computer, and while an e-mail I sent moments after the call has been leaked, my notes have not been.

The grand jury asked about one of the more interesting lines in that e-mail, in which I refer to my conversation with Rove as being on "double super secret background," a line that's raised a few eyebrows ever since it leaked into the public domain. I told the grand jury that the phrase is not a journalistic term of art but a reference to the film *Animal House*, in which John Belushi's wild Delta House fraternity is placed on "double secret probation." ("Super" was my own addition.) In fact, I told the grand jury, Rove told me the conversation was on "deep background." I explained to the grand jury that I take the term to mean that I can use the material but not quote it, and that I must keep the identity of my source confidential.

Rove went on to say that Wilson had not been sent to Niger by the director of the CIA and, I believe from my subsequent e-mails--although it's not in my notes--that Rove added that Dick Cheney didn't send him either. Indeed, the next day the Vice President's chief of staff, I. Lewis (Scooter) Libby, told me Cheney had not been responsible for Wilson's mission.

Much of my grand jury session revolved around my notes and my e-mails. (Those e-mails and notes were given to the special counsel when Time Inc., over my objections, complied with a court order.) Owing to my typing, some words were a jumble. For instance, I wrote "don't get too war out on Wilson," when I clearly meant "far out." There were some words in my notes that I could not account for--at one point they read, "...notable..." I didn't know if that was Rove's word or mine, and one grand juror asked if it might mean "not able," as in "Wilson was not an able person." I said that was possible, but I just didn't recall that. The notes, and my subsequent e-mails, go on to indicate that Rove told me material was going to be declassified in the coming days that would cast doubt on Wilson's mission and his findings.

As for Wilson's wife, I told the grand jury I was certain that Rove never used her name and that, indeed, I did not learn her name until the following week, when I either saw it in Robert Novak's column or Googled her, I can't recall which. Rove did, however, clearly indicate that she worked at the "agency"--by that, I told the grand jury, I inferred that he obviously meant the CIA and not, say, the Environmental Protection Agency. Rove added that she worked on "WMD" (the abbreviation for weapons of mass destruction) issues and that she was responsible for sending Wilson. This was the first time I had heard anything about Wilson's wife.

Rove never once indicated to me that she had any kind of covert status. I told the grand jury something else about my conversation with Rove. Although it's not reflected in my notes or subsequent e-mails, I have a distinct memory of Rove ending the call by saying, "I've already said too much." This could have meant he was worried about being indiscreet, or it could have meant he was late for a meeting or something else. I don't know, but that sign-off has been in my memory for two years.

This was actually my second testimony for the special prosecutor. In August 2004, I gave limited testimony about my conversations with Scooter Libby. Libby had also given me a specific waiver, and I gave a deposition in the office of my attorney. I have never discussed that conversation until now. In that testimony, I recounted an on-the-record conversation with Libby that moved to background. On the record, he denied that Cheney knew about or played any role in the Wilson trip to Niger. On background, I asked Libby if he had heard anything about Wilson's wife sending her husband to Niger. Libby replied, "Yeah, I've heard that too," or words to that effect. Like Rove, Libby never used Valerie Plame's name or indicated that her status was covert, and he never told me that he had heard about Plame from other reporters, as some press accounts have indicated. Did Fitzgerald's questions give me a sense of where the investigation is heading? Perhaps. He asked me several different ways if Rove indicated how he had heard that Plame worked at the CIA. (He did not, I told the grand jury.) Maybe Fitzgerald is interested in whether Rove knew her CIA ties through a person or through a document.

A surprising line of questioning had to do with, of all things, welfare reform. The prosecutor asked if I had ever called Mr. Rove about the topic of welfare reform. Just the day before my grand jury testimony Rove's lawyer, Robert Luskin, had told journalists that when I telephoned Rove that July, it was about welfare reform and that I suddenly switched topics to the Wilson matter. After my grand jury appearance, I did go back and review my e-mails from that week, and it seems as if I was, at the beginning of the week, hoping to publish an article in TIME on lessons of the 1996 welfare-reform law, but the article got put aside, as often happens when news overtakes story plans. My welfare-reform story ran as a short item two months later, and I was asked about it extensively. To me this suggested that Rove may have testified that we had talked about welfare reform, and indeed earlier in the week, I may have left a message with his office asking if I could talk to him about welfare reform. But I can't find any record of talking about it with him on July 11, and I don't recall doing so.

So did Rove leak Plame's name to me, or tell me she was covert? No. Was it through my conversation with Rove that I learned for the first time that Wilson's wife worked at the CIA and may have been responsible for sending him? Yes. Did Rove say that she worked at the "agency" on "WMD"? Yes. When he said things would be declassified soon, was that itself impermissible? I don't know. Is any of this a crime? Beats me. At this point, I'm as curious as anyone else to see what Patrick Fitzgerald has.


■ ARCHIVE PICKS

**Flight**
May 30, 1927
Lindbergh completed his 3,600-mile conquest of the Atlantic in 33 hours, 29 minutes, at an average speed of 107.5 miles per hour. Read TIME's report of his historic flight

**Ambition: Why Some People Are Most Likely To Succeed**
Nov. 14, 2005
A fire in the belly doesn't light itself. Does the spark of ambition lie in genes, family, culture—or even in your own hands? Science has answers

**How to Tune Up Your Brain**
Jan. 16, 2006
In a special report, TIME explores the latest research on how to stay mentally sharp. In a

# EXHIBIT Z

Case 1:06-mc-00123-RBW    Document 7-6    Filed 05/01/2006    Page 25 of 39



# TIME ARCHIVE
### 1923 to the Present

Nation

# What Scooter Libby And I Talked About

**EXCLUSIVE: A TIME correspondent recounts his role in the Libby case**

By MATTHEW COOPER/WASHINGTON

Sunday, Oct. 30, 2005

I was wet, smelling of chlorine. It was July 12, 2003, in Washington, a beautiful summer day, and I had just come back from swimming. All morning I had been trying to reach I. Lewis (Scooter) Libby for a cover story about both President George W. Bush's claim that Iraq had sought uranium in Africa and former Ambassador Joseph Wilson's controversial Op-Ed. I had been invited to a fancy Washington country club by friends. Since the club didn't allow the use of cell phones, I kept running from pool to parking lot to try to reach Libby, who was traveling to Norfolk, Va., with Vice President Dick Cheney for the commissioning of the U.S.S. Ronald Reagan. Eventually I raced home without showering in order to take Libby's call. When he finally reached me at around 3 p.m., we spoke for a few minutes as I sprawled on my bed. I had no idea that that brief phone call, along with a conversation with Karl Rove the day before, would leave me embroiled in a federal investigation for more than two years and that Libby would end up facing a five-count indictment. I doubt it occurred to Libby either. That afternoon, we talked a bit on background and off the record, and he gave me an on-the-record quote distancing Cheney from Wilson's fact-finding trip to Africa for the CIA. In fact, he was so eager to distance his boss from Wilson that a few days later, he called to rebuke me for not having used the whole quote in the piece. We updated the online version of the story, and I went on to co-author a piece for TIME.com called "A War on Wilson?," which would attract the attention of special prosecutor Patrick Fitzgerald.

Almost a year passed between those pieces and my legal woes. In May 2004 I was subpoenaed by Fitzgerald, who was interested in my conversation with Libby. Since part of our conversation was on background, I, along with Time Inc.--which would be formally subpoenaed a few months later because the company controlled my computer-written notes and e-mails--fought the order to protect the principle of source confidentiality. We lost, and in early August 2004 we were both facing contempt. For Time Inc., part of the global behemoth Time Warner, that meant a fine; for me, jail.

On Aug. 5, 2004, the night before Time Inc. and I were scheduled to be sentenced, I called Libby to see if he would grant a waiver for my testifying. The lawyers representing Time Inc. and me, who supported my making that call, thought Libby might well do so. After all, he had granted a waiver to a Washington Post reporter, and Tim Russert of NBC had just avoided contempt by testifying about his end of his conversation with Libby. Most important, my exchange with Libby about Wilson had been short and, in my thinking and Time Inc.'s, not especially provocative. When I reached Libby to ask for the waiver I told him, "I've been called before the grand jury, and I think they're going to ask me about a conversation we had about a year ago. Most of it was on the record, but part of it wasn't, and I wanted to see if I could get your permission to talk about the part that wasn't on the record." I told him that I would tell the truth about our conversation. Libby told me that he used to be a lawyer and that "to be safe" our attorneys should talk and if it was O.K. with them, it was O.K. with him. So the following week my attorney, Floyd Abrams, spoke with Libby's lawyer, Joseph Tate, and they hammered out the details of the waiver. On Aug. 23, I had a tuna sandwich and gave a deposition in Abrams' Washington office about the conversation. The Wilson part that really interested Fitzgerald was tiny, as I told TIME readers. Basically, I asked Libby if

Case 1:06-mc-00123-RBW    Document 7-6    Filed 05/01/2006    Page 26 of 39

he had heard anything about Wilson's wife having been involved in sending him to Niger. Libby responded with words to the effect of, "Yeah, I've heard that too."

The contempt citation was lifted against me that day, and I breathed easy. As it turned out, a week later, Fitzgerald came back and insisted he wanted to know what another source had told me, and the struggle began all over again, with my refusing to name the source and Time Inc. fighting the case all the way to the Supreme Court--which in June upheld the lower court's demand that the company turn over my notes and that I testify. Until now, that is the part of my involvement in the Plame affair that has drawn the biggest headlines: Time Inc. did turn over my notes, over my objections, and my other source--Rove--did grant me a waiver to testify (see "What I Told the Grand Jury," July 25, 2005).

I was surprised last week that the Libby indictment even mentioned me. But apparently his recollection of the conversation differed from mine in a way that led the prosecutor to think he was lying. As for me, I still have no idea if Libby or anyone else has committed a crime. I only know that if there is a Libby trial, I'll testify truthfully and completely, as I did before the grand jury.

Copyright © 2005 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.

Privacy Policy

# EXHIBIT AA



**MSNBC.com**

**Newsweek**

# Back on the Stand

**Rove's latest trip to the grand jury leaves his fate in the Plame leak case as mysterious as ever.**

**By Michael Isikoff and Evan Thomas**
Newsweek
Updated: 12:05 a.m. ET April 30, 2006

May 8, 2006 issue - It was August 2004, and special prosecutor Patrick Fitzgerald was zeroing in on I. Lewis (Scooter) Libby as the leaker in the Valerie Plame case. Fitzgerald had been quizzing reporters, searching for evidence that the vice president's chief of staff had leaked the identity of the CIA covert operative to a news organization in an attempt to undermine her husband, former ambassador Joseph Wilson, who had been an irritant to the Bush administration. Wary of identifying their confidential sources, reporters from big news organizations like The Washington Post and NBC were talking to Fitzgerald under strict ground rules aimed at narrowing the scope of his questions.

Matt Cooper, Time magazine's deputy Washington bureau chief at the time, agreed to tell Fitzgerald about his contacts with Libby—but not about his conversations with anyone else. Given permission to testify by Libby, who waived the usual reporter-source confidentiality agreement, Cooper met with Fitzgerald at the Washington office of Cooper's lawyer, First Amendment expert Floyd Abrams. Yes, Cooper acknowledged to the prosecutor, he had spoken to Libby. And, yes, Libby had confirmed that Wilson's wife had worked at the CIA and had played a role in sending Wilson to Africa on a fact-finding trip aimed at discovering whether Saddam Hussein's Iraq was trying to buy uranium from the country of Niger. But according to Cooper, Libby had been offhand, passive— "Yeah, I've heard that, too," Libby allegedly replied when Cooper asked him about the role played by Wilson's wife. In other words, Libby was not Cooper's original source. Well, then, who was?

Fitzgerald seemed to be "surprised," according to a knowledgeable source who declined to be identified discussing a criminal investigation. He broke off the questioning to consult with a colleague, and then began to question Cooper over and over, methodically trying to make sure he wasn't missing something. The prosecutor had to wonder: was someone else in the administration besides Libby a player in this drama? Fitzgerald is the sort of prosecutor whose very being is offended by deception and who will go to great lengths to pursue the truth. Ultimately, Fitzgerald discovered that Cooper's original source was Karl Rove, the president's political adviser who last month stepped down from his job as White House deputy chief of staff to focus on the November elections. Last October, Fitzgerald indicted Libby for lying to a grand jury. (Libby has mounted an all-out defense against the charges). But the dogged prosecutor is still pursuing Rove. Last week Rove testified before a grand jury for the fifth time in a little more than two years. Rove's lawyer, Bob Luskin, says that Rove is not a "target" of the grand jury—meaning that the prosecutor has not warned him that an indictment is imminent.

It is impossible to know if Fitzgerald will make a case against Rove. But it is possible now to trace how Fitzgerald came to suspect Rove of not telling the whole truth. The Bush administration has been particularly quick to trigger leak investigations. Often, these probes in high-profile cases are intended to punish political enemies. But this is one that has boomeranged.

In February 2004, Rove testified before Fitzgerald's grand jury—twice. He told of speaking briefly to columnist Bob Novak about the Wilson trip. But Rove never mentioned any conversation with Time's Cooper. Then, in October 2004, Rove, through his lawyer Luskin, suddenly turned over to the special prosecutor an e-mail, sent to Stephen Hadley, then deputy national-security adviser, that clearly showed that Rove had spoken to Cooper. Reappearing before the grand jury that month, Rove acknowledged that he must have spoken to Cooper, but he still didn't remember doing so. Rove's e-mail to Hadley suggested that Cooper had telephoned him in July 2003 about something else—welfare reform—and then switched the conversation to Wilson. Rove, according to the e-mail, didn't say much more to Cooper other than to warn him that Time shouldn't get "far out front" on the story Ambassador Wilson was telling—that the Bush administration was lying about WMD in Iraq and that,

specifically, Wilson, on his trip to Niger, had found no evidence that Saddam was trying to buy uranium for atom-bomb making.

There the investigation stood until last summer—when Fitzgerald seemed to make a breakthrough. Threatened with jail, Cooper through his lawyer got a green light from Luskin to testify about his original source. Cooper told a different story of his conversation with Rove than the version Rove had given the grand jury. According to Cooper's own e-mail to his editors (first reported by NEWSWEEK last summer), Rove identified Wilson's wife as a CIA official who sent Wilson to Africa.

Now Rove was on the hot seat. Summoned back to the grand jury last October for a fourth time, Rove said it was "possible" that he had told Cooper about Wilson's wife, but he had simply forgotten it. It appears that Rove's lawyer saved his client from an indictment. Just before Fitzgerald indicted Libby last fall, he met with Luskin and told him that he was considering indicting Rove, according to a source close to Rove who declined to be identified discussing sensitive matters. Luskin, says this source, made a final plea. Among other things, Luskin told the prosecutor that sometime between October 2003 and January 2004 he'd had a drink with Time reporter Viveca Novak. An old friend of Luskin's, Novak (who is no relation to the columnist of the same last name) surprised Luskin by telling him that Rove might have been Cooper's source. Last week, in an interview with NEWSWEEK, Novak described the conversation. Luskin, Novak recalls, said that Rove "didn't have a Cooper problem," meaning that Rove had not been Cooper's source. "That's not what I hear," Novak recalls responding. At that point, Luskin's demeanor changed, says Novak. "He got very serious from what I told him. He reacted as though he were learning it for the first time." (Novak had heard about Cooper's source from chatter inside the Washington bureau of Time; she recently took a buyout from the magazine.)

Luskin alerted Rove to the conversation, but his client still didn't remember it, according to a source close to Rove who declined to be named discussing sensitive legal matters. Luskin seemed to be signaling to Fitzgerald that Rove was truthful when he said he didn't remember the Cooper phone call; otherwise, why would he testify as such when he knew that others, including Cooper, could contradict him? (One possible explanation: Rove may have assumed Cooper would protect him as a confidential source.) Luskin did make a renewed search of Rove's files, the source says. That's what turned up the e-mail to Hadley. Fitzgerald was sufficiently slowed up by Luskin's story to hold off on indicting Rove, according to the source.

But Fitzgerald is nothing if not relentless, and he has kept after Rove. He has continued to take testimony in the case. Last week, according to a source close to Rove who refused to be identified discussing secret grand-jury proceedings, Rove testified that he would have had no motive to deliberately conceal his conversation with Cooper. "It would have been crazy" of Rove "to testify about [his conversations with Bob Novak] but not testify about the Cooper conversation," says this source, who adds that Rove would have known he would be "stepping into a perjury trap."

Rove and his legal team hope they will be cleared soon. It is not clear whether Fitzgerald is just tying up loose ends or building a case. Some lawyers suspect that he may be playing a tactical game with Libby's defense team. By keeping a file open on Rove, he can resist requests from Libby's lawyers to "discover" documents relating to the ongoing investigation. Such gamesmanship, however, may be too clever by half for Fitzgerald, who is regarded as anything but sly or devious.

The White House says that Rove's decision to step down as deputy chief of staff was not in any way caused by Fitzgerald's persistent investigation. Rove is at once expressive and not the sort to give away much. On the day of his grand-jury testimony, the man the president once called "the Architect" seemed jolly at a party at a fancy Georgetown restaurant to celebrate the 10th anniversary of "Fox News Sunday." Chatting about his testimony with a fellow partygoer, he cheerfully asked, "How's it playing out there?"

*With Mark Hosenball*

© 2006 MSNBC.com

# EXHIBIT BB

 **MSNBC.com**

# Transcript for July 17
**Matt Cooper, John Podesta, Ken Mehlman, Bob Woodward, Carl Bernstein**

NBC News
Updated: 1:57 p.m. ET July 17, 2005

PLEASE CREDIT ANY QUOTES OR EXCERPTS FROM THIS NBC TELEVISION PROGRAM TO "NBC NEWS' MEET THE PRESS."

Sunday, July 17, 2005

**GUESTS:** Matt Cooper, White House Correspondent, *Time Magazine*; John Podesta, President and CEO, "Center for American Progress" and Former Chief of Staff, President Bill Clinton; Ken Mehlman, Chairman, Republican National Committee; Bob Woodward, *Washington Post* and author, *"The Secret Man: The Story of Watergate's Deep* Throat" and Carl Bernstein, former *Washington Post* Watergate Reporter

**MODERATOR/PANELIST:** Tim Russert, NBC News

MR. TIM RUSSERT: Our issues this Sunday: the investigation into the leak which identified Ambassador Joe Wilson's wife, Valerie Plame, as a CIA operative. This Time magazine reporter says his source released him from his pledge of confidentiality, allowing him to avoid jail by testifying on Wednesday. What did he say to the grand jury? He'll discuss it for the first here this morning. Our guest: Matt Cooper.

Then Newsweek magazine quotes Karl Rove as saying it was "Wilson's wife, who apparently works at the agency, who authorized the trip." What now for President Bush's deputy chief of staff? With us, Rove's former deputy, now chairman of the Republican National Committee, Ken Mehlman, and President Clinton's former chief of staff, John Podesta.

And 33 years ago, another famous source, Deep Throat, provided information which brought about the resignation of Richard M. Nixon. His identity has now been revealed and his story now chronicled in a new book: "The Secret Man." With us, Watergate reporters Bob Woodward and Carl Bernstein.

But, first, joining us now is Matt Cooper of Time magazine. Welcome.

MR. MATT COOPER: Morning, Tim.

MR. RUSSERT: This is the cover of your magazine: "Rove on the Spot," subtitled "What I Told the Grand Jury," by Matthew Cooper. And here is an excerpt from your article, which will be available tomorrow in Time magazine.

"So did [Karl] Rove leak Plame's name to me, or tell me she was covert? No. Was it through my conversation with Rove that I learned for the first time that [Joe] Wilson's wife worked at the CIA and may have been responsible for sending him?"--to Niger. "Yes. Did Rove say that she worked at the `agency' on `WMD'?"--weapons of mass destruction. "Yes. When he said things would be declassified soon, was that itself impermissible? I don't know."

For the record, the first time you learned that Joe Wilson's wife worked for the CIA was from Karl Rove?

MR. COOPER: That's correct.

MR. RUSSERT: And when Karl concluded his conversation with you, you write he said, "I've already said too much." What did that mean?

MR. COOPER: Well, I'm not sure what it meant, Tim. At first, you know, I thought maybe he meant "I've been indiscreet." But then, as I thought about it, I thought it might be just more benign, like "I've said too much; I've got to get to a meeting." I don't know exactly what he meant, but I do know that memory of that line has stayed in my head for two years.

MR. RUSSERT: When you were told that Joe Wilson's wife worked for the CIA, did you have any sense then that this is important or "I better be careful about identifying someone who works for the CIA"?

MR. COOPER: Well, I certainly thought it was important. I wrote it in the e-mail to my bosses moments later that has since leaked out after this long court battle I've been in. You know, I certainly thought it was important. But I didn't know her name at the time until, you know, after Bob Novak's column came out.

MR. RUSSERT: Did you have any reluctance writing something so important?

MR. COOPER: Well, I wrote it after Bob Novak's column had come out and identified her, so I was not in, you know, danger of outing her the way he did.

MR. RUSSERT: You also write in Time magazine this week, "This was actually my second testimony for the special prosecutor. In August 2004, I gave limited testimony about my conversation with [Vice President Dick Cheney's chief of staff] Scooter Libby. Libby had also given me a personal waiver, and I gave a deposition in the office of my attorney. I have never discussed that conversation until now. In that testimony, I recorded an on-the-record conversation with Libby that moved to background. On the record, he denied that Cheney knew"--of--"or played any role the Wilson trip to Niger. On background, I asked Libby if he had heard anything about Wilson's wife sending her husband to Niger. Libby replied, `Yeah, I've heard that, too,' or words to that effect."

Did you interpret that as a confirmation?

MR. COOPER: I did, yeah.

MR. RUSSERT: Did Mr. Libby say at any time that Joe Wilson's wife worked for the CIA?

MR. COOPER: No, he didn't say that.

MR. RUSSERT: But you said it to him?

MR. COOPER: I said, "Was she involved in sending him?," yeah.

MR. RUSSERT: And that she worked for the CIA?

MR. COOPER: I believe so.

MR. RUSSERT: The piece that you finally ran in Time magazine on July 17th, it says, "And some government officials have noted to Time in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction. These officials have suggested that she was involved in her husband's being

dispatched to Niger..."

"Some government officials"--That is Rove and Libby?

MR. COOPER: Yes, those were among the sources for that, yeah.

MR. RUSSERT: Are there more?

MR. COOPER: I don't want to get into it, but it's possible.

MR. RUSSERT: Have you told the grand jury about that?

MR. COOPER: The grand jury knows what I know, yes.

MR. RUSSERT: That there may have been more sources?

MR. COOPER: Yes.

MR. RUSSERT: The big discussion, Matt Cooper, has been about your willingness to testify...

MR. COOPER: Sure.

MR. RUSSERT: ...before the grand jury. And let's go through that. This was Wednesday, July 6, Matt Cooper talking to the assembled press corps.

(Videotape, July 6, 2005):

MR. COOPER: This morning, in what can only be described as a stunning set of developments, that source agreed to give me a specific, personal and unambiguous waiver to speak before the grand jury.

(End videotape)

MR. RUSSERT: Now, Karl Rove's attorney has spoken to The Washington Post. "[Karl Rove's attorney, Robert] Luskin has said that he merely reaffirmed the blanket waiver by Rove ...and that the assurance would have been available at any time. He said that [Matt] Cooper's description of last-minute theatrics `does not look so good' and that `it just looks to me like there was less a desire to protect a source.'"

MR. COOPER: Well, can I back up a little bit, Tim? For two years, you know, I have protected the identity of my sources. As you know, I was in a rather infamous court battle that went through all the courts in Washington, right up to the Supreme Court, and we lost there with a special prosecutor trying to get me to disclose my source. My principle the whole time was that no court and no corporation can release me from a pledge of confidentiality with my source. And so even after Time magazine, over my objections, handed over my notes and e-mails, which included, really, everything I had and identified all my sources, I still believed that I needed some kind of personal release from the source himself.

And so on the morning of that clip you just saw, my lawyer called me and had seen in The Wall Street Journal that morning Mr. Rove's lawyer saying, "Karl does not stand by any confidentiality with these conversations," or words to that effect, and then went on to say, "If Matt Cooper's going to jail, it's not for Karl Rove." And at that point, at that point only, my lawyer contacted Mr. Rove's lawyer and said, you know, "Can we get a kind of personal waiver that applies to Matt?" And Mr. Luskin and he worked out an agreement and we have a letter that says that "Mr. Rove waives

confidentiality for conversations with Matt Cooper in July 2003." So it's specific to me and it's personal, and that's why I felt comfortable, only at that point, going to testify before the grand jury. And once I testified before the grand jury, then I felt I should share that with the readers of Time.

MR. RUSSERT: Mr. Luskin, Rove's attorney, is suggesting that you had the same waiver throughout the last two years, and only when you were confronted with going to jail did you, in effect, decide to compromise your source or not protect your source.

MR. COOPER: Well, I protected my source all along. I don't maintain that I haven't. I have all the way along, and that's why we went to the Supreme Court. That's why I stood by the source even after Time had disclosed my documents. We went to Rove only after seeing his lawyer, in some sense, invite us to, in that quote in The Wall Street Journal. My lawyers and the editors at the time did not feel it was appropriate for me to go and approach Rove about some kind of waiver before then.

MR. RUSSERT: In your piece, as I mentioned, you said "some government officials," and you said it may be more than just Rove and Libby. Did you get waivers from those additional sources when you testified before the grand jury?

MR. COOPER: I don't want to get into anything else, but I don't--anything I discuss before the grand jury, I have a waiver for.

MR. RUSSERT: Norman Pearlstine, editor in chief...

MR. COOPER: Sure.

MR. RUSSERT: ...of Time magazine, authorized the release of your e-mails and notes to the prosecutor. Pearlstine said this: "I found myself really coming to the conclusion that once the Supreme Court has spoken in a case involving national security and a grand jury, we are not above the law and we have to behave the way ordinary citizens do." Do you agree?

MR. COOPER: In part. I mean, I think Norman Pearlstine made a very tough decision. I spent a lot of time with him and I admired the way he made it. I disagreed. I thought we should have at least, you know, gone forward, gone into civil contempt. I would have been willing to go to jail. I think we should have, you know, held on a little longer, but that's a reasonable, you know, disagreement between people.

MR. RUSSERT: Now, he came to Washington, Pearlstine, and some other editors from New Work and met with the Washington bureau of Time magazine.

MR. COOPER: Sure.

MR. RUSSERT: At least two correspondents produced e-mails saying, "Our sources are now telling us they will no longer confide in Time magazine. They will no longer trust us to protect our sources." Is that going to be a long-term problem for your magazine?

MR. COOPER: Well, I think, you know, Time will have to, you know, reassure confidential sources that we're going to continue to rely on them and continue to protect them. You know, this--Tim, I think the important thing is here that one aberration in this case was it went all the way to the Supreme Court, and it was then--you know, Time did decide in this case to turn over the notes. Now, Pearlstine has said that in other cases he might not. I think the important thing to remember here is that, you know, the reporters of Time will keep their word. I kept my word for two years. I didn't feel like any court or corporation could release me from that confidence, and I kept my word and so only spoke with the grand jury after I received that written personal waiver from my

source.

MR. RUSSERT:  You are going to testify this week before Congress for a shield law.  Explain that.

MR. COOPER:  Sure .  Well, Tim, you know, this is the 12th day, I believe, of my colleague Judith Miller from The New York Times being in jail in this investigation because she did not get a waiver that she feels comfortable with and she's protecting her sources.  There's incredible aberration, Tim.  Forty- nine states have some kind of protection for journalists and their confidential sources, but there is no protection at the federal level.  And so in a bipartisan way, Republicans and Democrats have put forward legislation in Congress to create some kind of protection for whistle-blowers and confidential sources and other people who want to come forward to the press so there'd be some kind of federal law, too.

MR. RUSSERT:  What's your biggest regret in this whole matter?

MR. COOPER:  Well, I'm not sure I have that many.  I mean, I believe the story I wrote was entirely accurate and fair, and I stand by it.  And I think it was important because it was about an important thing that was going on.  It was called A War on Wilson, and I believe there was something like a war on Wilson going on.  I guess I'd be a little more discreet about my e-mails, I think.  I'm an object lesson in that, you know, e-mails have a way of getting out.

MR. RUSSERT:  Will this affect your career as a journalist?

MR. COOPER:  I don't think it should, Tim.  I kept my word to my source.  I only spoke after I got a waiver from that source.  That's what other journalists have done in this case.  I don't think it should.

MR. RUSSERT:  How did you find the grand jury?

MR. COOPER:  I was surprised, Tim.  You know, I'd heard this old line that grand jurors are very passive, that they'll indict a ham sandwich if the prosecutor tells them.  I thought this grand jury was very interested in the case.  They--a lot of the questions I answered were posed by them as opposed to the prosecutor.  I thought they were very involved.

MR. RUSSERT:  Where do you think it's heading?

MR. COOPER:  You know, I really don't know, Tim.  I've been, you know, involved in this case as anyone, I guess, for a couple of years now, and at times I think it's a very big case, at times I think it's, you know, politics as usual and not going to be that big a case at all.  I just don't know.

MR. RUSSERT:  And we'll find out.  Matt Cooper, we thank you very much for joining us and sharing your views.

MR. COOPER:  Thank you, Tim.

MR. RUSSERT:  Coming next, the future of President Bush's deputy chief of staff, Karl Rove.  We'll talk to his primary defender, Ken Mehlman, chairman of the Republican National Committee, and John Podesta, President Clinton's chief of staff, who's had a lot of experience in damage control.

Then "The Secret Man," the story behind Deep Throat.  Bob Woodward and Carl Bernstein will talk about the importance of anonymous sources, right here on MEET THE PRESS.

(Announcements)

# EXHIBIT CC





**International Edition** |  Netscap

Member Center:  **Sign In** |  **Register**                    ▶ **MAKE CNN.com YOUR HOME PAGE**



**SEARCH**     ◉ The Web   ○ CNN.com     [                    ]  [      ]  Powered by

| Menu |
|------|
| Home Page |
| World |
| U.S. |
| Weather |
| Business |
| Sports |
| Politics |
| Law |
| Technology |
| Science & Space |
| Health |
| Entertainment |
| Travel |
| Education |
| Special Reports |
| Autos |
| **SERVICES** |
| Video |
| E-mail Newsletters |
| Your E-mail Alerts |
| RSS |
| CNNtoGO |
| TV Commercials |
| Contact Us |
| SEARCH |

Web ◉ CNN.com ○



Powered by

# TRANSCRIPTS  Transcript Providers

┌─ **Shows By Category:** ─┐

**Return to Transcripts main page**

## CNN RELIABLE SOURCES

**Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Should Journalists Have Covered Steroid Abuse in Baseball Earlier?**

Aired December 12, 2004 - 11:30   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

┌advertiser links┐                                              what's this

**Buy USA Flags Online**
We offer great prices on flags and flagpoles. Free shipping on all... flagpolesetc.com

**Buy American Car Flag Here**
Patriotic flags, magnets, pins, apparel, car flags and much... www.flagsoncars.com

**Mardi Gras Zone - US Flags and Beads**
Show your patriotism in a fun way. We're a large supplier of U.S.... mardigraszone.com

**Polyester U.S. Flags for Sale Online**
Butterfly chair covers, chair frames and more for your home at... www.toledoenterprises.com

(BEGIN VIDEOTAPE)

HOWARD KURTZ, HOST (voice-over): Planted question. Was the reporter playing fair by having a soldier ask Donald Rumsfeld about the troops feeling vulnerable?

Striking out. Was the press rooting on the likes of Barry Bonds and Jason Giambi as they bulked up their bodies and their home run totals, or should journalists have cried foul about steroids years ago? Warner Wolf joins our discussion.

Risking jail. "Time's" Matt Cooper explains why he would rather serve time than reveal his confidential sources.

Plus, why is "The Baltimore Sun" suing Maryland's governor?

(END VIDEOTAPE)

KURTZ: Welcome to RELIABLE SOURCES. I'm Howard Kurtz. A jam- packed show today. And we begin with what seemed like a spontaneous moment, a tough question from an American soldier to the secretary of defense.

(BEGIN VIDEO CLIP)

SPC. THOMAS WILSON, U.S. ARMY: Now why do we soldiers have to dig through local landfills for pieces of scrap metal and compromised ballistic glass to up-armor our vehicles, and why don't we have those resources readily available to us?

(APPLAUSE)

DONALD RUMSFELD, SECRETARY OF DEFENSE: You go to war with the army you have, not the army you might want or wish to have at a later time.

(END VIDEO CLIP)

KURTZ: But that question in Kuwait on Wednesday was planted by Edward Lee Pitts, an embedded reporter for "The Chattanooga Times Free Press." He admitted in an e-mail, which ended up on the Web, that he prodded the soldier into asking the question.

Joining me now at the Pentagon, CNN senior Pentagon correspondent, Jamie McIntyre. And here with me in the studio, "Time" magazine's White House correspondent, Matt Cooper.

Matt Cooper, was it unfair, underhanded or sneaky for Pitts to ask the soldier to ask Rumsfeld that question?

MATT COOPER, TIME: No, I don't think so. I think it was clever. And look, the soldier was perfectly free not to ask it.

Clearly, it was something that was on the soldier's mind and the minds of the other soldiers at the event, who whoope and hollered when he asked the question.

You know, this reporter probably should have mentioned in his own story that he'd been way involved in kind of planti the seeds of the question. But...

KURTZ: Should have mentioned that he stage-managed this, that he helped orchestrate this emotional moment.

COOPER: Yeah.

KURTZ: Jamie McIntyre, would you have done such a thing?

JAMIE MCINTYRE, CNN SR. PENTAGON CORRESPONDENT: Well, I've certainly been in crowds of soldiers, and when they've expressed an opinion about something, I might have encouraged them, you know, to -- if someone said me, gee, we're really concerned about armor, I might have said, boy, you know, you might ask the secretary, that's wl this is here.

I think the question here though is that this issue has been around a long time. Lots of stories have been written abou it. Congress is asking questions, stories have been written, including Edward Pitts', but what made this an event was that -- not that it came from a reporter or a member of Congress, but from one of the soldiers on the front lines. And tl fact that it might not have happened had this not been orchestrated by a reporter, I think is something that could cros: the line.

KURTZ: And would you agree therefore that "The Chattanooga Times Free Press" made a mistake, as its editor, Tom Griscom, now acknowledges, in not at least disclosing that this was not some spontaneous emotional outburst on the soldier's part, but that the reporter had worked on the question with the soldier in advance, as he -- as the reporter lat admitted in this e-mail.

MCINTYRE: Right. And also arranged for him to be called on. I think that the paper has acknowledged in the discussions with CNN that in retrospect, that should have been disclosed. I think they have disclosed it in the follow-u article that they've done.

But again, this became a real seminal event. It sparked a whole debate about the armor thing. And it was because it came from the soldier. Now we find out it actually came from a reporter, who also brought the soldier with him, and as you said, didn't just suggest he write a question, but said he worked on it with him. And it looked like the soldier was actually reading it initially from a piece of paper. So I think it does cross a line.

KURTZ: None of us had any way of knowing that in advance. Jamie McIntyre at the Pentagon, thanks very much for joining us.

Matt Cooper, want to turn now to your legal situation. As the whole world, I think, knows, you've been cited for conten of court in the case involving Valerie Plame and the outing of her status as a CIA operative. There was a federal appeals court hearing this week, two of the three judges did not sound sympathetic to your lawyer, Floyd Abrams, wh is also representing Judith Miller of "The New York Times." How worried are you at this point about actually having to go to jail?

COOPER: Oh, well, Howie, I would have to be foolish not to be a little bit unsettled by that prospect. But look, this is r about me, it's really about the question of the reporters able to do their jobs and be able to retain confidential sources And you know, it's worrisome to me. I've got a colleague, though, Michael Weisskopf, who lost his arm in Iraq, just down the hall from me. I mean, that's suffering, and what I'm going through is just the tedium of the American legal system.

KURTZ: But are you frustrated or angry that, as you see it, you were doing your job, you may have to pay for that by spending time behind bars?

COOPER: Well, I do, and I'm also baffled by it, frankly, this investigation has centered on, you know, Robert Novak, tl CNN commentator and columnist who originally mentioned the CIA operative's name in print. I don't know how putting me in jail is going to reveal who leaked to Robert Novak, or what that was about.

KURTZ: Would you view yourself as outing Valerie Plame? Your story last year ran three days after Novak's column.

COOPER: No, I don't. I mean, it was out, and I mentioned her by name. What I was trying to do in my piece in July of 2003, Howard, was to point out what the leakers were doing. I was trying to call attention to it. And I think Novak was a way kind of a transmission belt for the leakers, basically repeating their smears.

I was trying to say, hey, they're smearing this guy. There are some malevolent things going on here. Take a look.

KURTZ: Judith Miller, who, as I mentioned, also faces jail time. She is a "New York Times" reporter, had this to say th other day on CNN.

(BEGIN VIDEO CLIP)

JUDITH MILLER, THE NEW YORK TIMES: I don't think journalists really responded with the alarm that we should have. Some liberal journalists said, oh, Bob Novak is conservative, he was carrying water for the president and therefore he didn't deserve the protection of the First Amendment. Well, I think we were all a little perhaps quiescent about this threat.

(END VIDEO CLIP)

KURTZ: Does she have a point?

COOPER: I think I might differ with my co-defendant, Judy, on this. I mean, I think the press -- I don't recall anyone in the press saying Bob Novak didn't have the same right to protect his sources that Judy or I do. So I'm not quite sure I agree with her on that.

KURTZ: This is not a theoretical possibility. Jim Taricani, Rhode Island television reporter, was sentenced this week. He has also been cited for contempt in a source case. He was sentenced to six months of home confinement. The judge said the only reason he didn't send him to jail was because he has had a heart transplant.

In Taricani's case, the source at the last minute voluntarily came forward. Why are you still protecting the source or sources in this case, who, after all, may have possibly committed a crime in leaking the name of Valerie Plame?

COOPER: Sure. Well, I think there is a larger principle at issue here, Howard, which is protecting the confidentiality of sources. I think if reporters go picking and choosing which confidences to honor, which ones we'll break, whether we think our sources have proper motivations or not, we're really going to send a message to all potential sources who may be whistle-blowers uncovering government waste or what-not, that reporters' words can't be trusted.

And so I feel a need to protect this confidence, despite that.

KURTZ: And on that point, what has been the effect of all this on your daily reporting right now?

COOPER: Well, it has taken up some time and it's obviously unsettling to have to go through the legal system.

KURTZ: Chilling effect?

COOPER: Haven't seen the chilling effect, but I think in part by standing firm here I think if anyone doubted I could keep a secret I think they've seen I can.

KURTZ: Have you asked the source or sources involved to consider coming forward so that you don't have to face the possibility of going to jail?

COOPER: Well, I had this very thing happen earlier in the year. I did give a limited deposition to the special counsel after one of my sources, the vice president's chief of staff, Lewis Libby, waived me, essentially, of confidentiality...

KURTZ: You quoted him by name in that article. COOPER: Yes. And I went to him personally and said, look, can I talk about anything we might have discussed confidentially? And I got his explicit assurance. I didn't rely on one of these written waivers that's getting a lot of attention now. And I went ahead and did that. I certainly have no problem with the you know, if the source, if him- or herself wants to be outed, so to speak, I don't think it's a problem for the journalist to do it.

KURTZ: All right. You're married to a Democratic consultant, Mandy Grunwald, I'm sure she understands what's going on here, but what about your 6-year-old son, what do you tell him about this?

COOPER: Well, we haven't, Howard, it has been a strange situation. I mean, I -- he does not watch CNN. He does not read "The New York Times." And so he doesn't know about this case. And we've kept him blissfully ignorant. Our feeling is, why worry him? Frankly, it's a very hard case to understand. It's very hard to explain...

KURTZ: Even for grown-ups.

COOPER: Even to me.

KURTZ: But what if you have to explain why you're going away for a while?

COOPER: Well, I think that's going to be very hard to do. I'm going to try to make the point that I'm doing it for what I hope is an honorable reason. And you know, that there's a principle involved here.

KURTZ: All right. Matt Cooper, thanks very much for joining us.

COOPER: Thanks, Howard.